Angela Delvin-Brown, Ed.D.
Educational Consultant
1888 Dayron Trace
Marietta, Georgia
770-973-1336

December 20, 2013

AMENDED March 31, 2014

Jonathan Zimring, Esq.
ZIMRING LAW FIRM
1425-A Dutch Valley Place
Atlanta, GA 30324.
404.607.1600, ext. 7001

Craig Goodmark, Esq.
Goodmark Law Firm
209B Swanton Way
Decatur, GA 30030
404-719-4848

Dear Sirs:

I have been asked to review records and depositions in the matter of SHADAWN POWELL, vs. VALDOSTA CITY SCHOOLS, NO: 7:13-CV-53-HL. IN THE UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF GEORGIA VALDOSTA DIVISION.

My vitae is attached.

<u>Document Review</u>

In preparation of this opinion, I have reviewed the following information and documents:

- Deposition of Francisco L. Diaz
- Deposition of Shadawn Powell
- Deposition of Mr. Robert Davis
- GTEP Manual
- Evaluations of Shadawn Powell

Exhibit 1

- Student records
- Phone conference interview with Shadawn Powell

Certification review of administrators

Addition Materials for Amended Consideration:

- Deposition and attachments Dr. William Carson
- Deposition and attachments of Assistant Principal Chappius
- Deposition and attachments Laura Lucas (Special Education Director)
- Deposition and attachments Sheila Mason Lawson
- Deposition and attachments Kimberly McSwain
- Deposition and attachments Judy Pittman

**Findings**:

Based on the review of this information, my expertise, experience and training in the field of special education and general education, I offer the following findings :

I.   Background

The Individuals with Disabilities Education Act defines special education, as included below, in terms of "specially designed instruction to meet the unique needs of a child with a disability".  Instruction can occur in a variety of settings and includes speech and other therapies and supports as determined by the Individual Education Program (IEP).

Special education is**:** (a) *General*. (1) *Special education* means specially designed instruction, at no cost to the parents, to meet the unique needs of a child with a disability, including—(i) Instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (ii) Instruction in physical education. (2) *Special education* includes each of the following, if the services otherwise meet the requirements of paragraph (a)(1) of this section—(i) Speech-language pathology services, or any other related service, if the service is considered special education rather than a related service under State standards; (ii) Travel training; and (iii) Vocational education.34 C.F.R. §300.309.

As used in the definition above, the term "specially designed instruction" means "adapting, as appropriate to the needs of an eligible child under this part, the content, methodology, or delivery of instruction— (i) To address the unique needs of the child that result from the child's disability; and  (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children." 34 C.F.R. §300.39(b)(3).

Thus, as part of designing the instruction to fit the needs of a specific child with a disability in public school, adaptations may be made in the content, methodology, or delivery of instruction for students with disabilities.

IDEA and special education processes and classrooms often involve significant differences amongst students, IEPs and services. The special education classroom teacher must manage these differences. This teacher must also manage her staff, the detailed IEP creation and review process and the overall provision of services.   In addition, frequent IEP Team meetings occur that are regulated and must meet specific requirements.

The evaluation of special education teachers is often not reflected in the standard evaluation forms, if one compares their special and additional duties and circumstances, Indeed, the job description for the special education teacher contains extra duties and responsibilities.  Unlike regular education teachers that serve primarily non-disabled students, special education teachers, especially in an elementary school where the students' start as young as three years old, carry additional health and safety concerns that other teachers do not.  For students with significant medical needs during the school day, the special education teacher must be responsible for medical issues that affect educational performance.  These medical issues are primary and must be addressed immediately to protect the health and safety of the disabled student.

<u>Special Education as Specially Designed Instruction</u>

In Ms. Powell's class, there was an extremely broad and diverse group of students with unique special education needs to address.  Areas of student disability and needs included Down Syndrome, autism, severe speech and language delay, including children who were non-verbal, had physical disabilities, including cerebral palsy and breathing difficulties,  children who were non-ambulatory without assistance, those who needed feeding tubes and suctioning daily, those who had behavioral disorders, attention deficit disorder, were vision impaired, had hearing difficulties and wore aids, and had significant developmental delay in all areas.  Several children were verbal and had opportunities for inclusion for one or more academic subjects in the general education classroom.

A.      Ms. Powell's Class had Particular Challenges

The extreme of the range of needs in this class, coupled with not only the range of functioning in multiple areas per student but also the range of grade placements as well is significant for a number of reasons.  First, the instruction that could be expected in a class of as many as thirteen students with significant cognitive, social,

communicative, physical and behavioral deficits would challenge any teacher in remarkable and important ways.  Without the help of highly qualified assistants or paraprofessionals, simply addressing the physical needs of many of these students would be extremely challenging.  I have observed other students with similar ranges of significant needs in other school settings, who each have full time adult paraprofessional support provided to them on a daily basis.  This class had one teacher and two paraprofessionals, stretching the limits of teachers and paraprofessionals in no doubt significant ways.

Some of the students had serious medical needs. This requires the teacher to be aware of these needs and manage the team's ability to protect the student and address anticipated treatment interventions or respond to emergencies.  This includes ensuring that transportation is appropriate starting with the student's arrival at school. This is often a priority need and must be fulfilled by staff assignment, and if not by the administrator in charge then, by necessity the classroom teacher. These are necessary and expected obligations of a special education teacher with medically fragile students that do not necessarily exist for other staff.   Given the students in her class, Ms. Powell had an obligation, acknowledged by Ms. Lucas and Dr. Cason, of protecting these needs as a priority in the morning.  The administration had the obligation of providing staff for the receipt of medical equipment or allowing Ms. Powell the time and opportunity without censure to manage the situation.  The logistical realities that Ms. Powell had to walk to the student drop off area with medical equipment for her student using a ventilator were the responsibility of Mr. Diaz, the assistant principal.

B.      Instructional Techniques Employed by Powell

With IDEA and the requirement of specially designed instruction as the guide, instruction of students with significant disabilities can and should vary widely, depending on functioning levels of the students in various areas, their rate of progress toward goals, their learning and retention rates, their ability to attend, comprehend and participate at various levels of instruction all are factors that can impact learning.  The impact of the disability of the student's learning must be addressed in the IEP and in classroom instruction.  This specially designed instruction can take various forms throughout a student's instructional day and can include whole group, small group and one to one instruction.

A variety of other student supports and supplemental aids and services can also be provided to students with disabilities as determined during the IEP process.  In the

classroom, whole group activities in a self -contained setting, while not intended to always be at the precise instructional level of students, often serve as the point from which specially designed instruction in the self -contained class can occur later in small groups.

1.      Individual Modifications

In Ms. Powell's class, to the untrained eye, the small group activities may have seemed similar for all students.  But teachers such as Ms. Powell who are well versed in the knowledge of the functioning levels and disabilities of their students, understand that subtle adjustments such as giving a student a non-verbal cue for instructions instead of a verbal cue in a small group setting can be a step toward that student's IEP goal completion.  Some students may be provided more guidance in the task completion activity vs less guidance to achieve their different learning goals.  Some students may be working with a non - preferred teacher vs a preferred teacher, as indicated in their IEP.  Just as in a general education classroom, also in which whole group activities rarely are or can be designed to meet each student's precise individual needs, large group instruction can serve to further establish a sense of the learning community in the classroom. [1]

2.      Peer Modeling

Students recognize each other as fellow classmates, peers and potential learning partners.  In Ms. Powell's class, the large group activity could also have served as a point in the day when some students serve as models for other students.  This peer

---

[1]      By example Assistant Principal Chappius testified in her deposition that she was familiar with A.K., another student served in Ms. Powell's class ( p. 54) and had "glanced through his IEP".  In the deposition, Mr. Zimring asked if Ms. Chappius was aware that A.K. has a multitude of disabilities and physical needs, including needing oxygen, breathing treatments, and a G-tube.  Ms. Chappius replied affirmatively that she was aware of these things.  She was also asked about A.K.'s cognitive functioning, as it was identified as an I.Q. score of 56. (p.62).  Ms. Chappius was then asked to describe MoID ( Moderately Intellectually Disabled) functioning.  She replied that it could range from "SDD ( Significantly Developmentally Delayed) to Specific learning Disability to Other Health Impaired and it depends on the score".  This response is another indicator that while Ms. Chappius may have testified that she was generally aware of some of this student's issues, that the specific individual needs and how these impacted Ms. Powell's responsibilities and the operation of the classroom were not part of this assessment process and not fully understood by the administrative staff.

modeling approach is a powerful and well documented special education strategy supported by research.  And although much research has focused on the role of the non-disabled peer as the model for the peer with disabilities, opportunities for peer role models also existed in Ms. Powell's classroom.  The diverse group of students included several students who were verbal and had higher levels of cognitive, academic and / or behavioral strengths that could easily have been peer models for other students in Ms. Powell's classroom.

        3.      Use of Whole Group as Assessment Tool

The focus of the whole group instruction in a special education class can, and could have been for Ms. Powell, a third option, that of  a pre assessment or ongoing assessment activity, where teachers such as Ms. Powell determine from students' responses or engagement the specific follow up activity that occurs next or in the following series of lessons..  Assessment is an ongoing feature in a special education classroom.  But that assessment may not always take a written form at the precise point of intervention, especially with diverse students such as Ms. Powell's.  Students with significant and multiple disabilities in Ms. Powell's class usually show progress at rates that are far below that of a more typical student.  While students with multiple and significant disabilities can and should have access to content presented in general education settings, as well as specially designed instruction to meet their unique needs, they often require substantially more time to reach criterion on skills targeted for instruction than is allowed in the more typical unit approach used in most general education settings. Research indicates that students with similar disabilities and functional levels as in Ms. Powell's class took as many as 69 discrete sessions to acquire functional and core curriculum related to their specific IEP goals.  The untrained observer may be unaware of the rate of progress and variety of strategies and interventions that are central to the progress of students with disabilities, especially if they are unaware of the specific disabilities of the students observed and the impact on learning.  When that moment of progression occurs, perhaps in a whole group setting surrounded by some peers who may be modeling more appropriate behavior or responses, observant teachers such as Ms. Powell, who may circulate in order to be informed of the entire group's progression, can use the moment to continue the learning momentum at that instant and in future lessons as well.  In addition, Ms. Powell was rated satisfactory on Managing the Learning Environment on the 2-7-12 observation with the comment that she was "observant of whole class during instruction" but marked NI under Supporting Students in Teaching Task II for "allowing" the paraprofessional to lead the two small groups. Mr. Diaz, the observer, already noted, as

confirmed by my statements above, that Ms. Powell was observant of the whole class. This observation could have been a method of assessment, planning for future instruction, planning for adjustments in student or instructor tasks to name of few valid instructional reasons.  Ms. Powell could not have been observant of the whole group, and marked ' S'if she had been leading a small group.  It seems a glaring contradiction which is not supported by the evaluation as a whole to give a teacher an NI for the very task she is marked satisfactory on in another section.

Written feedback to Ms. Powell on the 12-12-11 evaluation by Ms. Chappius included comments and an NI in Use of Time under Teaching Task III.  The comment included the statement that center time was monitored by a paraprofessional while Ms. Powell worked with a student on a craft.  Ms. Chappius commented that the arrangement should have been switched.  Ms. Chappius also commented that instructional time was not maximized because there was too much wait time for students who did not need as much support as others.  The section on Use of Time was marked as an NI.  A key point not noted in this observation by M. Chapius is that one of the three instructors in the classroom had to leave the class during this observation for thirty minutes.  This was unplanned due to events of the day.  Lesson plans that are developed and implemented with three instructors, especially in a class of this type with an extremely broad range of significant student needs, may be impossible to properly and appropriately adjust in the 'spur of the moment' when there is a loss of adult instructional personnel.  It seems reasonable that the observation could have been postponed or at least this fact noted in the feedback section to take this major and last minute change into consideration by Ms. Chappius.  The failure to document this loss of instructional personnel gives a false impression of the planned classroom learning environment at that time.  In addition, at least one IEP of a student lists difficulties the child has working with a 'non-preferred' teacher.  This need of children with significant disabilities, especially children with autism and other diagnoses, is well documented in education. Transitioning from adults who are known, trusted and may have a special rapport with the student to another adult with whom that same relationship has not been established is often extremely hard for the student.  Such a transition may cause a behavioral meltdown, refusal to participate or other behaviors nonproductive to the student's learning.  Ms. Powell may have been working with such a student at the time of the observation.  The comment by the observer that this was a task the paraprofessional should have done does not take into account individual student learning needs and again, may have noted a false picture of perceived ineffective practices.  The practice used by Ms. Powell may have been extremely appropriate for

the short amount of time Ms. Powell was engaged in this activity with this student. Apparently no follow up by Ms. Chappius occurred to delve into the student learning needs further for purposes of this observation.

C.     Language Limitations Impacted Ms. Powell's Classroom Instruction

Of significant impact on the whole group, small group and one to one instruction determined in each student's IEP in Ms. Powell's class, in addition to other specific areas of disability such as intellectual disability, Down Syndrome, visual impairment and autism  was the issue of the level and intensity of identified speech and language disorders of her students.  This one area of student functioning had a major impact on programming and implementation of grouping strategies in the classroom.  Almost every student, with few exceptions, had receptive or expressive   language delays.  The range of communication of the students varied widely.  A few students were verbal. Most students had significant receptive and expressive language delays.  Some students were completely non-verbal.  One student used an augmentative communication device in the classroom.   The wide range of both receptive and expressive language skills made instructional planning no doubt complex and necessarily individualized. Determining student response levels to tasks could be very complex based on how instruction was delivered, the task to be completed and the determination if the student understood  the task itself, the steps involved, and the method of response. Programming of this nature necessitates a precise approach that is rarely beneficial outside of a one to one instructional arrangement.

Students with speech and language impairments have difficulty with the sound systems of language, the structure of words, the meaning of words, the relationship of words in sentences, and / or the functional use of language for communication . The students in Ms. Powell's class had significant difficulties in listening comprehension, oral expression, social interactions, reading, writing, and spelling. All these areas impacted by speech and language impairments must be accounted for in instructional design, implementation and evaluation.  These tasks alone, as if this was all Ms. Powell had to take into consideration for specially designed instruction, would keep a speech language pathologist very busy on a daily basis.

While many of these students received speech language services, and Ms. Powell and the speech therapist may have collaborated from time to time, these speech language services were noted as pull out services that occurred outside Ms. Powell's

classroom. This location of delivery of speech/language services  likely provided little direct insight for Ms. Powell in her design of instruction for her students, leaving this significant responsibility for in class language supports and specially designed instruction incorporating these significant student needs largely on her shoulders. The fact that the class ratio was approximately three or four students to one adult on a daily basis represents an even greater challenge to the effective programming and progress monitoring of students in this class.

> D.     Implementation of Individualized Student Goals/Objectives

The IEP's for students in Ms. Powell's class document a wide variety and range of goals. The level of necessary intensity of the instruction would appear to be significant, even for students who had some minimal level of communication.  A sample of goals from the IEP's of the students in the class included the following and ranged from functional to pre-academic to academic to behavioral: " Use a tissue to clean face and nose, trace name with a model, count by rote to 50, respond to yes/no questions, urinate in toilet, use words to communicate anger, identify 50 sight words, read 30 high frequency words, accept help from non-preferred teacher, identify colors and objects."  Instruction for students with significant disabilities should generally include focus on at least several of the following areas:

Specific, discrete response like choice making (Kennedy & Haring, 1993)
Set of discrete responses like a list of sight words (Collins, Branson, & Hall, 1995)
Chained response like task analysis for dressing or laundry (McDonnell & McFarland, 1988)
Generalized response like requesting (Chadsey-Rusch & Halle, 1992)
Pivotal response like self-initiation (Koegel, et al., 1999) or problem solving (Hughes, et al., 1996)

Systematic prompting with feedback is used extensively in research with students with severe disabilities.   Ms. Powell's IEPs for students in her class included goals related to each of these areas for specific students.

> E. IEP and IEP Planning Process

IDEA and state procedures carefully regulate the IEP planning process.  This is often the specific responsibility of the classroom teacher who is identified as the

manager of the IEP and IEP Team.  VCSD used classroom teachers to manage IEP meetings.  The IEP Meeting is the primary vehicle for including the parent in an assessment of the progress of the placement, the need for services, planning IEP goals and objectives and discussion among other things of the current levels of functioning and supports for the student.  Ms. Powell was responsible for coordinating this, making copies, calling and providing notices of the meeting and apparently chairing and convening the meeting.  Parent participation is essential to maintain throughout this process. Any consideration of the performance of the teacher should include these tasks and responsibilities. In addition, the IEP Meeting day can be a time of stress and tension for the teacher. Administrators must contribute to the process by allowing the teacher the opportunity to prepare and manage the meeting.  Ms. Powell had such meetings on a day she was confronted by Mr. Diaz while she was trying to finalize her preparations. Confronting the teacher in the middle of such a day jeopardizes this process.

II.    <u>Differentiated Instruction in the special education classroom</u>

More "traditional" classrooms, even for students with disabilities who receive services there through an inclusive model, might offer the opportunity to differentiate instruction for students.  The concept of Differentiated Instruction was derived from approaches in the general education classroom, and is driven by the main instructional idea that specific content and the need to meet the varying learner needs in the general education setting according to their readiness levels, interests and learning style will be based on the curricular content to be taught, the process of how it could be taught and/or the manner in which learning is assessed (the "product").

A.    Specially Designed vs. Differentiated

The key difference between differentiated instruction in a general education classroom and an individualized instructional approach in a special education classroom is unitary content focus.  A general education teacher or even co teachers in a general education classroom might use a unitary concept such as migration to teach a unit built around why people and animals migrate in order to meet a variety of needs. Differentiated instruction begins with concepts or big ideas that are then developed into principles or enduring understandings that are timeless, abstract and lend themselves to higher order thinking and tasks for students.  Teachers then take the conceptual focus of instruction and design a unit of study that looks at the content, the process of learning and the products that students can develop and/or complete and then differentiate according to students' readiness levels (NOT functional/overall

performance levels); interests and learning style preferences.  The typical unit of study may vary in length from a week to several months and can be interdisciplinary as well.

This pure form of differentiated instruction has become confused with an individualized approach to student learning as denoted in IDEA as specially designed instruction, described above.  Individualized instruction has never been the focus or premise of differentiated instruction, although they are often confused.  Dr. Carol Tomlinson, the University of Virginia professor credited nationally with developing the concept of differentiated instruction stated in 1996 : "When you're creating a differentiated task, you really aren't about the idea of trying to find something totally different for each student to do. What you really are trying to do is have all of the students focus on the same big idea or essential understanding."   Clearly this concept of pure differentiated instruction was not an approach readily considered or even appropriate for students in Ms. Powell's class due to their level of functioning.  Their needs were met by the specially designed instruction, as required by IDEA and set forth in their IEP's.

III.   Evaluation of Special Education Teacher Classroom Performance

A.     The Measure of Effectiveness is Student Progress

Clearly, progress was made toward IEP goals by individual students in Ms. Powell's class.  Several IEP's document parent satisfaction with their student's progress. At least two students were moved from non- or partial inclusion in Ms. Powell's class to more extensive inclusive services in academic areas via a co-taught arrangement in the general education classroom.  Multiple students made progress toward goals on their IEP's, clearly a sign of teacher success.  The range of student needs, the range of student functioning levels, the multiple grade ranges in the class all likely contributed to drive the instructional decisions of Ms. Powell for her students in a challenging educational environment where daily she addressed the functional needs, academic needs, behavioral needs, ambulatory needs, feeding and breathing needs of her students in a successful manner, while directing and supervising the tasks of two paraprofessional under her direct guidance.

B.     The Limitations of the GTOI as an Evaluation Tool for Special Education Teachers

Administrative observers using the Teacher Evaluation Instrument at the time, the GTOI, had no documented formal training in special education, other than the one

required course for all teachers, did not review all of the IEP's of students in her class prior to observations, did not review psychological evaluations and/or eligibility reports for her students prior to observations.  Records also do not show any pattern of administrative attendance and participation at the students' IEP meetings, where administrative participation could have added to their knowledge  and understanding and perhaps appreciation of Ms. Powell's students , their significant needs, and the many and varied challenges faced by their teacher and support staff. Preconference/pre observation meetings between administrators and Ms. Powell did not occur that could have enhanced the working knowledge of the special education instruction provided by Ms. Powell and the paraprofessionals under her guidance and direction. Misinterpretation and misapplication by observers of various suggested practices on the evaluation instrument, which was not designed with special education teachers of students with significant disabilities in mind, could very likely have been avoided.

Dr. William Cason, the Superintendent of the Valdosta City School System at the time of these observations and evaluations testified in his deposition that  "It is universally understood and I understand that the IEP is the guiding instrument for the education of disabled students" ( P. 54). Dr. Cason further indicated that the GTOI was "a poor instrument for evaluating teachers" and that this instrument used "in Ms. Powell's case and in any teacher's case at that particular time in our school history was not adequate." P. 42.  Dr. Cason described the GTOI as "general" (p. 43) and "not keyed to the job descriptions of the teachers, especially the substantial additional duties and responsibilities under IDEA and the special education rules and laws" of special education teachers (p. 43).  Dr. Cason further identified that "it was the principal using strictly just the instrument and relied on short observations in the classrooms and that was one of the weaknesses" of this evaluation tool (p. 44).  Dr. Cason also indicated there was "room for subjectivity" in the GTOI (p. 45).

C.      The Failure to Use the GTOI Process as Designed

The depositions and record support that the GTOI process was not used as intended and designed, assuming it was an adequate approach. This created pressure on Ms. Powell and its resulting use.  If legitimate issues were identified by the evaluative observation process of a teacher through the use of the GTOI, the state process required that a professional development plan  (PDP) be written for the teacher in question in order to support the areas of professional need and foster growth and change.  Yet no PDP was ever written for Ms. Powell in order to address any issues of alleged unsatisfactory performance that was indicated by her untrained and uninformed supervisors.  Also relative to Ms. Powell's performance was the fact that no

complaints or concerns had been brought to the attention of the Valdosta City Schools Special Education Director, Ms. Laura Lucas, or to Ms. Sheila Lawson, the Director of Human Resources for Valdosta City Schools.  Ms. Lawson also verified in her testimony that it is the assistant principals' "responsibility and obligation to be fully prepared to conduct an evaluation" (p. 18).  Ms. Lawson further verified that 'it is not the teacher's responsibility to provide additional information to the evaluator before and after the evaluation to insure validity' (p. 18).  In fact, Ms. Lawson testified that "The administrators, including those at Mason Elementary School, had an obligation to ensure the validity of the assessment of their staff." (p. 19). School supervisory staff who have neither the special education skills and knowledge or who fail to avail themselves to information and staff that can ultimately provide such critical information fall seriously deficient in their duties as supervisors to help teachers grow in their professional expertise

## Summary of Opinions and Conclusions:

   I.   Use of Special Education

The extreme of the range of needs of the students in this class, coupled with not only the range of functioning in multiple areas per student but also the range of grade placements created an environment where specially designed instruction required significantly more attention and different approaches than the regular education practice of differentiation of instruction.   Moreover, the issue of the level and intensity of identified speech and language disorders of Ms. Powell's student had a major impact on programming and implementation of grouping strategies in the classroom.  Programming of this nature necessitates a precise approach that is rarely beneficial outside of a one to one instructional arrangement and is foreign to educators not accustomed or familiar with the special education process. These issues also are impacted by available supports and the adjustments teachers made in the special education classroom on student's individual needs. If the support is unavailable this makes a significant difference in addressing all the students especially in group situations.

   II.   Evaluation of Special Education Classroom/Application of Regular Education
        Concepts

The administrative observers appeared inadequately familiar with the circumstances in Ms. Powell's classroom to properly administer the Teacher Evaluation Instrument at the time, the GTOI.  The administrators had

no documented formal training in special education. They did not review all of the
IEP's of students in her class prior to observations, and did not review
psychological evaluations and/or eligibility reports for her students prior
to observations. They have not demonstrated they had an understanding of Ms.
Powell's students, their significant needs, and the many and varied challenges faced by
their teacher and support staff. Ultimately, the true measure of an educator is whether
the students were learning and in Ms. Powell's class, progress was made toward IEP
goals by most individual students. Thus, under the special education rules, this was
reasonable and appropriate progress and therefore appropriate instruction.

III.   Legitimacy of NI's on Observations

A.   Failure to Differentiate - The concept of Differentiated Instruction was derived
from approaches in the general education classroom. While students with
disabilities can and should participate in differentiated instructional activities,
these typically occur in the context of the general education classroom and not in
the classroom where Ms. Powell was teaching.

B.   Build for Transfer -  The students in Ms. Powell's class had significant
difficulties in listening comprehension, oral expression, social
interactions, reading, writing, and spelling. All these areas impacted by speech
and language impairments must be accounted for in instructional
design, implementation and evaluation. Her teaching technique with respect
to building for transfer was driven by the nature of the disabilities in
the classroom and would not allow for one single method of executing this
technique. For example, because of the disabilities in the classroom, a summary of
content either before or after a lesson may have required up to thirteen different
deliveries. This is not an appropriate method to ensure continuity in a
special education classroom and is disruptive to the learning experience.

C.   Use of Time - The fact that the class ratio was approximately three or four
students to one adult on a daily basis represents an even greater challenge to the
effective programming and progress monitoring of students in this class. For Ms.
Powell, use of uncertified educators such as paraprofessionals was limited to
administrative, as opposed to substantive, support. Paraprofessionals could not
effectively implement many of the goals and objectives in the students' IEP's. Ms.
Powell was the only highly qualified educator in the classroom and was
responsible for the full implementation of the IEP's of every student in her
class. In addition, one observation was conducted with only one of two necessary

paraprofessionals present in the room during the majority of the observation period, due to an unexpected event of the day.  The lack of a second paraprofessional was held against Ms. Powell in the evaluation, resulting in several NI's.  Ms. Powell's overall appropriate use of the personnel available to her is evident by the students' progress and the consistent data collection and progress monitoring completed in the classroom as evidenced by the student records. The issues also limited and dictated how she would manage the instruction and what she could do as the teacher in this class. The issue of adequate numbers of highly trained personnel addressing the needs of the students in the classroom no doubt could have had a negative impact of student progress and performance.  It would appear that the dedicated and conscientious approach used by Ms. Powell contributed to student success despite having numerous obstacles to overcome on a daily basis.

IV.     Overall Performance and Classroom Management – Special Education

Ms. Powell appears by available information and testimony to be able to manage staff who worked under her supervision and who at least in some cases lacked a high degree of knowledge and training in the area of young children with significant and multiple cognitive, behavioral, communicative and physical disabilities.  She appeared to understand her primary duties to her students and their health and safety.  The students under her instruction and care also made educational and behavioral progress, in some cases to a significant degree.  Ms. Powell was a strong advocate for the needs of her students, including their physical health and well-being.  She spoke up for those students unable to speak and advocate for themselves.  That honorable trait in teachers is not always positively acknowledged and rewarded.  It certainly should not be censured as her students, their parents, and the system itself relies upon that trait.

s/ *Angela Delvin-Brown, Ed.D.*

Educational Consultant

# ANGELA DELVIN-BROWN, Ed.D.
### VITAE
**1888 Dayron Trace**
**Marietta, Georgia 30062**
**Phone:  770-973-1336 / FAX : 770-973-5234**
**adelvinb@bellsouth.net**

## EDUCATION

**Ed.D.**        The University of Georgia : 1991.  Educational  Administration*.*
*Dissertation:  Effectiveness Factors of Student Support Teams.*

**M.S.**        George Peabody College for Teachers of Vanderbilt University.
Special Education:  1976*: LD, MR, EBD, Educational Diagnostician*

**B.S.**         George Peabody College for Teachers.  *Dual major in Elementary Education*
*and Special Education:* 1975. *Learning Disabilities, Mental Retardation, Emotional/*
*Behavioral Disorders and Speech/Language Development*

**Other**        University of Virginia: *Differentiated Instruction Institutes Summer Trainings from*
*2002-2005.*

**Additional Trainings (partial listing):**
Association for Supervision and Curriculum Development (ASCD) : Invited National
Training Cadre Member for Differentiated Instruction, 2006.
Council for Exceptional Children Regional Trainings in: Collaborative Teaching,
I.D.E.A. Reauthorization, Functional Behavioral Assessment and Positive Behavior
Supports.  2003-2009.
University of Oregon : Instructional Strategy and Curricular Modifications.  2003.
ASCD : Classroom Leadership, Concept-Based Instruction/ Understanding by Design,
Differentiated Instruction, 2001-2007.
Institute for Learning and Development: Collaboration Strategies. Austin, Texas.
1993.

## WORK EXPERIENCE

**1991–current Educational Consultant**

**2000–2002   Adjunct Assistant Professor of Special Education at Kennesaw State University and**
**Educational Consultant**

1

**1998-2000**   **Assistant Professor of Special Education at Kennesaw State  University. Taught graduate and undergraduate courses in special education law, behavior management, due process procedures and requirements for graduate students pursuing masters in special education or add-on certification.  Also taught Introduction to Special Education for undergraduate education majors.**

   **Co-Director, Project WINS – A three year $600,000 grant funded by the Developmental Disabilities Council of Georgia to develop an organization to support inclusive education in school systems throughout the state of Georgia.  Activities also included training and technical assistance statewide.**

**1981 - 1991**

   **Invited instructor at various colleges and universities throughout Georgia, including Georgia State University, The University of Georgia, North Georgia College, Macon Jr. College and Mercer University.  Topics included Collaboration, Cooperative Teaching, Least Restrictive Environment, Regulatory Issues and Student Support Teams, Behavior Management.**

**1977-1979**   **Part-Time Instructor, Austin Peay State University.  Taught Individual Education Program development, due process procedures, and strategies for parental involvement to undergraduate students.**

## OTHER PROFESSIONAL SERVICE :

**1991-Present** *Educational Consultant -*  **Provide training, coaching and evaluation for teachers, parents, students  and administrators in a variety of educational settings using various instructional delivery systems and assessments, including functional behavioral assessments.  Teacher/Paraprofessional/Administrator training areas include:  Differentiated Instruction, Collaborative Teaching, Instructional and Curricular Modifications for General Classroom Teachers and Paraprofessionals, Curricular and Support Options for Gifted Students, Effective Student Support Team Planning and Operation, New Special Education Teacher /Paraprofessional Training, Inclusive Practices, Teaching and Learning Strategies, Special Education Transition Services, Effective Communication Strategies for Educators and Parents, Effective Planning and Implementation of Section 504 of the Rehabilitation Act, IEP Development, Due Process Regulations and Procedures, Behavioral Management Strategies, Effective Inclusion of Students with Autism, Functional Behavioral Assessments.  Also develop and monitor behavior support plans, instructional modifications and accommodations and service delivery for students with disabilities.**

**2013**   **Expert Witness in S.M. vs Gwinnett County School System.  State of Georgia Administrative Hearing.  Atlanta, Georgia.**

**1993-Present** ***Parent to Parent Resource Consultant***   provide extensive free or low cost consultation services to parents of children with disabilities in Georgia .

## LEADERSHIP EXPERIENCE :

**2010-2012**   Trainer in Georgia statewide training effort through the Georgia Department of Education in Collaboration, Inclusion and Co-Teaching.

**1998**   ***Co-Director, Project WINS (Winning Ideas Network Schools), Kennesaw State University and the Governor's Council on Developmental Disabilities Council of Georgia***.  Three-year grant to develop a network of support and training for inclusive schools in Georgia.

**1997-1999**   ***Coordinator, Consultant and Trainer for the National Inclusive Schools Project in the Atlanta Public School System***.  Coordinated, trained and supported the training of staff movement from a categorical to a non-categorical service delivery system and effective inclusive schooling practices.

**1993**   ***Co-Director, the Metropolitan Atlanta Transition Services Fair*** in conjunction with Metro West Georgia Learning Resources Center, for high school students with disabilities, their parents and teachers.

**1991-1981**   ***Education Consultant, Georgia Department of Education***-Division for Exceptional Students, Atlanta, Georgia.  Technical assistance and training provided to 187 local school systems, regional hospitals, mental health facilities, youth development  centers, and other state agencies for ten years.  Activities also included policy development and implementation, state/federal regulations monitoring, university and other agency collaboration, development of training manuals, invited presenter at state and regional meetings and conferences, and coordinator of statewide conference on Specific Learning Disabilities.

**1977-1979**   ***Administrative Assistant to Coordinator of Special Programs*** Clarksville-Montgomery County School System, Clarksville, Tennessee.

***1975-1976*** ***Educational Diagnostic Team Member***, John F. Kennedy Child Study Center, George Peabody College for Teachers, Nashville, Tennessee. Behavioral/Educational/Diagnostic assessment of learning and behavior problems for students in the metro Nashville area and nearby states with accompanying prescriptive recommendations and collaboration with classroom teachers and parents, working under the direction of psychologists and neuropsychologists.

**1974-1976**   ***Student Administrative Assistant*** to Dr. Earl Davis, Associate Director, John F. Kennedy Child Study Center, George Peabody College for Teachers, Nashville, Tennessee.

1975        *Co-Director*, Adult Community Training Programs, Rochelle Training and Habilitation Center, Nashville, Tennessee.  Planned and implemented vocational training and supervision of adults with severe and profound disabilities and behavioral disorders in center and community settings.


## CLASSROOM, COLLABORATION AND TEACHING EXPERIENCES :

2012-2013   Collaboration with The University of Georgia Speech and Hearing Clinic professional staff for the support of a student with autism in the area of Executive Functioning.

2012-2013   Collaboration with Dr. S. Berger, neuropsychologist, Marietta, Georgia on various assessment cases.

2011-2012   Consultant to Georgia Advocacy Office,  Atlanta, Georgia.

2003-present Systemwide and Classroom Autism Coach/Consultant Supporting Successful Inclusion for Students with Autism.  Jackson County and various schools throughout Georgia.

1996-2000   Collaborative Instruction for general education and special education teacher training with Dr. John Langonne and Dr. Cindy Vail from the University of Georgia.

1979-1981   Marietta City Schools , Marietta, Georgia
            Lead Teacher – Middle school resource and self-contained cross-categorical program for students with learning disabilities, autism, behavior disorders and intellectual disabilities.

1976-1979   Clarksville-Montgomery County Schools, Clarksville, Tennessee.
            Teacher of Elementary Interrelated resource classes and a Junior High modified self-contained program for students with severe learning disabilities and behavioral disorders.

1974        Fort Jackson, South Carolina
            Summer Instructor, Adult Education (GED) and college course classes.

1973-1974   Midlands Center for the Retarded, Columbia, South Carolina.
            Summer Instructor of adolescents and adults with Profound Intellectual Disabilities, Autism and Significant Behavioral Disabilities.

1974 - 1975 Cora Howe Elementary School, Nashville, Tennessee
            Student Teacher of Fifth and Sixth grades.

## PUBLICATIONS and PROFESSIONAL MATERIALS DEVELOPMENT

**Delvin-Brown, A., Berger, S., and Walters, S. ( 2013 in press ):**
*-Executive Functioning Supports for Students with Autism*
*-Supporting Teachers' and Parents' Interpretation, Understanding and Use of the*
*Psychological Evaluation*

**Delvin, A. (1992).  Factors Related to Effective Student Support Team Operation.  *The Consulting Edge*.  Vol. 4. No. 1.  pp.1-4.**

**Delvin, A. (1993).  *Cooperative Teaching Training Manual.***

**Delvin, A. & Black, L. (1993).  *Metro Atlanta Transition Services Directory*.  Metro West GLRS.**

**Delvin, A. (1992).  *New Special Education Teachers Training Manual,* Georgia Department of Education. Atlanta, Georgia.**

**Delvin, A. (1988).  *Administrators' Guide to Legal Issues in Special Education.* Georgia State University. Atlanta, Georgia.**

***Professional Contributions to State of Georgia, Division for Exceptional Students Curriculum and Regulatory Procedures :***

**1990     *Student Support Team Regulations and Procedures*, Georgia Department of Education.**

**1990     *Corrective Action Plan Guidelines Handbook,* Georgia Department of Education.**

**1988     *Other Health Impaired Resource Guide*, Georgia Department of Education.**

**1985     *Specific Learning Disabilities Resource Guide*, Georgia Department of Education.**

**1985     *Individualized Education Program Resource Guide*, Georgia Department of Education.**

**1984     Participated in the development of *The Commitment to the United States District Court*, Savannah, Georgia, in resolution of the Georgia Branches of N.A.A.C.P. v. The State of Georgia (Marshall Case) and subsequent statewide trainings.**

**1984 -1985   Development of Pre-referral Strategies for Students with Disabilities and Student Support Team Regulations and Procedures, Georgia Department of Education.**

## PRESENTATIONS—partial listing

Delvin-Brown, A. and Walters, S. (2013).  *Beyond Telling: Targeting Initiation & Metacognition With Individuals on the Autism Spectrum*.  American Speech-Language-Hearing Association National Conference: Chicago, Illinois.

Delvin-Brown, A., Berger, S. and Walters, S. (2013).   *Revisiting Teamwork: Why SLPs & School Psychologists Make a Dream Team for Effective Student Assessment.*  American Speech-Language-Hearing Association National Conference: Chicago, Illinois.

Delvin-Brown, A. and Walters, S. (2013).  *Helping Students Show What They Know: Differentiating Classroom Instructions*.   American Speech-Language-Hearing Association National Conference: Chicago, Illinois.

Delvin-Brown, Angela (2012). *Statewide Webinar Presentation on Functional Behavioral Assessment and Behavior Intervention Plans* sponsored by Parent to Parent of Georgia.

Delvin-Brown, A. and Walters, S., 2006 and 2008.  University of Georgia Law School Presentation : *Understanding the Assessment Process*. Athens, Georgia.

Delvin-Brown, (2005).  *Successful Differentiation:  One School's  Journey*. Staff Development for Educators ( SDE ) National Conference on Differentiation.  Las Vegas, Nevada.

Delvin-Brown, A., Vance, C., Togut, T. et al.  (2004) *Functional Behavioral Assessment* State wide Workshop, sponsored by  Lorman Educational Services. Atlanta, Georgia.

Delvin-Brown, A. (2002) *Differentiation: What Special Educators Need to Know*. Georgia Council of Administrators of Special Education State Conference, Macon, Georgia.

Delvin-Brown, A. (2002). *Raising the Bar for ALL Students Through Differentiated Instruction*. Georgia Association for Gifted Children, Athens, Georgia.

Delvin-Brown, A. (2001).  *Raising the Bar for All Students through Differentiation.*  The Georgia Council for Exceptional Children. Athens, Georgia.

Delvin-Brown, A. (2000).  *Cluster Grouping and Collaboration: Possilbilities for Professional Growth.*  The Georgia Council for Exceptional Children, Macon, Georgia.

Brown, Susan; Delvin-Brown, A. & Strieker, T., ( 2000)  University and School System Partnerships : *Opportunities for Successful Inclusion with Differentiation of the Curriculum*. Georgia statewide Conference.   Kennesaw, Georgia.

**6**

**Brown, S., Delvin-Brown, A. & Strieker, T. (1999).** *Lessons Learned in a Three Year University/Metropolitan School System Partnership to Extend Inclusive Educational Practices.* **National Council on Mental Retardation.  Maui, Hawaii.**

**Delvin-Brown, A., Jones, F. & Strieker, T. (1999)** *Enhancing the  Collaborative Partnership Between General Educators and Support Staff.* **University Affiliated Programs National Conference, Honolulu, Hawaii.**

**Delvin-Brown, A., Smith, C.,& Watson, G. (1999)** *Improving Student Performance Through Collaborative Services: Results Of a Five Year Study.* **Atlanta, Georgia: The International Learning Disabilities Association.**

**Brown, S. Delvin-Brown, A. & Wallace, D. (1999)** *Indicators for Effective Teacher Preparation Programs.* **International Council for Exceptional Children.  Charlotte, North Carolina.**

**Delvin-Brown, A., Judkins, L. (1998).** *Collaborative Tools for Teachers.* **Athens, Georgia: Better All Together National Conference.**

**Delvin-Brown, A., Jones, C., & Miles, W. (1997).** *Supporting Effective Collaborative Teaching:  Challenges for General and Special Education.* **Savannah, Georgia: National Teacher Education Division of the Council for Exceptional Children.**

**Delvin-Brown, A. (1997).** *Collaborative Teaming:  Models of Support for Students with Specific Learning Disabilities.* **Chicago, Illinois:  Learning Disabilities Association.**

**Delvin-Brown, A. (1996).** *Collaborative Skills for Successful Teaming.* **Helen, Georgia: Georgia Special Education Administrator's Conference.**

**Delvin, A. (1996).** *Collaborative Teaching: An Effective Model for Inclusive Schools.* **Columbus, Georgia:  Georgia Federation of the Council for Exceptional Children.**

**Delvin, A. & Woods, K. (1996)** *Designing Inclusive Supports for Students with Severe Disabilities.* **Aspen, Colorado:  Institute for Learning and Development National Conference.**

**Delvin, A. & West, F. (1996).** *Decision-Making Strategies for Collaborative Teaming.* **Orlando, Florida:  Learning Disabilities Association International Conference.**

**Delvin, A.,  Jones, S. & Judkins, L. (1995).** *Collaborative Teaching.* **Athens, Georgia: Interactive Teaching Network,  National Satellite Broadcast, The University of Georgia, William Bender and Phillip McLoughlin: Producers.**

**Brazell, D., & Delvin, A. (1995).** *Support Mechanisms Necessary for Teachers in Inclusive Settings:  Results of a Statewide Study.* **Orlando, Florida: International Learning Disabilities Association.**

Delvin, A. (1994).  *Perspectives and Outcome Data for Learning Disabled Students in a Collaborative Teaching Model.*  Washington, D.C.:  International Learning Disabilities Association.

 Delvin, A., Judkins, L. & Sellers, L. (1993).  *Collaborative Service Delivery for the Learning Disabled: Lessons Learned.*  San Francisco, California. International Learning Disabilities Association.

Delvin, A. (1993).  *Models of Collaboration.*  Columbus, Georgia.  Georgia Federation of the Council for Exceptional Children.

Delvin, A. (1992).  *An Effective Collaborative Vehicle:  The Student Support Team.*  Aspen, Colorado:  The Institute for Learning and Development National Conference.

Delvin, A., Purdy, J. & Swan, W. (1992).  *Using the Student Support Team Process to Help Students with Learning and Behavior Problems.*  Atlanta, Georgia: International Learning Disabilities Association Conference.

Delvin, A. & Swan, W. (1992).  *Effective Student Support Team Operation as Related to Special Education Referral and Placement Rates.*  Baltimore, Maryland: International Council for Exceptional Children Annual Conference.

Delvin, A. (1991).  *Effective Student Support Teams.*  Atlanta, Georgia:  Learning Disabilities Association of Georgia.

Delvin, A. &  Parko, E. (1990)  *Identified Weaknesses in Individualized Education Program Development in Georgia's Local School Systems.*  Atlanta, Georgia:  Georgia College and Universities Statewide Forum.

Delvin, A. & Wise, L. (1989).  *Training Needs of  Special Education Teachers in Due Process Procedures.* Augusta, Georgia:  Georgia Council for Administrators of Special Education for the Council for Exceptional Children.

Delvin, A. (1988).  *Georgia's Compliance Monitoring Data and Its Impact on School Psychology Services.*  Helen, Georgia:  Georgia Association of School Psychologists.

Delvin, A. & Callaway, L. (1986).  *Leadership Essentials for New Special Education Directors.*  Atlanta, Georgia:  Georgia Department of Education New Special Education Directors' Conference.


# PROFESSIONAL MEMBERSHIPS

Council for Exceptional Children
Learning Disabilities Association
Association for Supervision and Curriculum Development
Phi Delta Kappa
Kappa Delta Pi

National Association for the Gifted
Georgia Association for the Gifted
Children and Adults with Attention Deficit Disorder ( CHADD )


## COMMUNITY PROFESSIONAL SERVICE

2013 -  Invited Planning Coordinator,  Supporting Adolescent Mental Health Issues Conference for Georgia Schools and Parents ( in process).

2009 – present- Post 5 and Post 6 Cobb County Board of Education Facilities and Technology Committee Appointed Representative for SPLOST III and SPLOST IV oversight.  Marietta, Georgia.

2008 -  Appointed member, Cobb County Board of Education Block Scheduling Committee.  Marietta, Georgia.

2006 -  2009   President, The Center for Advanced Studies Foundation, Wheeler High School,  Marietta, Georgia.

2005 – 2009   Co President, Wheeler High School PTSA. Marietta, Georgia.

2003 – 2006   Vice President, Center for Advanced Studies Foundation, Wheeler High School.  Marietta, Georgia.

2001-2002     President, The Association for the Gifted, Georgia Division, The Council for Exceptional Children.

2001-2003     Co-President, Simpson Middle School PTSA, Cobb County Schools. Marietta, Georgia.

1993-Present    Consultant to the Georgia Parent to Parent Resource Network

1997-1999        Co-President, Kincaid Elementary School PTA, Cobb County Schools. Marietta, Georgia.

1996- 1997      Co-Vice President, Simpson Middle School PTSA, and Education and Literacy Co-Chair, Kincaid Elementary School, Cobb County, Georgia.

May, 1999       Invited Georgia Representative, National Summit on Learning Disabilities, Washington, D.C.

1998 – 1999.   Kennesaw State University Parent Forum Planning Committee

1996- present  Member,  Southern Association of Colleges and Schools (SACS) accrediting teams for local school systems

**1998-present  Sunday School Teacher, Piedmont Road Church of Christ
Bible Studies Curriculum Coordinator, Piedmont Road Church of Christ
Marietta, Georgia.**