**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | |
|---|---|
| **SHADAWN POWELL,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:13-CV-53 (HL) |
| **VALDOSTA CITY SCHOOL DISTRICT, SUPERINTENDENT DR. WILLIAM O. CASON, Individually and in his Official Capacity, PRINCIPAL JOHN L. DAVIS, and MS. KATIE L. CHAPPUS, Individually and in her Official Capacity**, | |
| Defendants. | |

## ORDER

Before the Court are Defendants' Motion for Summary Judgment (Doc. 27) and Daubert Motion to Exclude the Testimony of Angela Delvin-Brown (Doc. 26). The Court held a hearing on these motions on September 17, 2014. For the reasons stated below, the Daubert motion is granted in part and denied in part, and the motion for summary judgment is granted in part and denied in part.

## I.     Motion for Summary Judgment

### A.     Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c); *see* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. <u>Id.</u> at 254–55. The court may not, however, make credibility determinations or weigh the evidence. <u>Id.</u> at 255; *see also* <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." <u>Celotex</u>, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. <u>Id.</u> at 324-26. This evidence must consist of more than conclusory allegations. *See* <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment must

be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

### B.    Factual Summary

This case arises from the decision in March 2012 not to renew Plaintiff Shadawn Powell's contract as a special education teacher at S. L. Mason Elementary School ("Mason Elementary School") in the Valdosta City School District ("the School District"). Plaintiff Shadawn Powell ("Plaintiff") first began teaching at Mason Elementary School in the 2009–2010 school year, and she remained at the school until the non-renewal decision. During these years, Defendant William Cason ("Superintendent Cason") was the superintendent of the School District, Defendant John Davis ("Principal Davis") was the principal at Mason Elementary School, and Defendant Katie Chappuis ("Chappuis") and Francisco Diaz ("Diaz") were the assistant principals at the school. The principal and assistant principals were Plaintiff's supervisors. (Defendants' Statement of Undisputed Material Facts ("DSMF"), Doc. 28, ¶¶1–3).

Prior to November 1, 2011, Plaintiff's supervisors perceived her teaching performance as satisfactory, but beginning around that date Plaintiff repeatedly came into conflict with the school's administrators. (Id. at ¶¶5–7; Deposition of Principal John Davis, Doc. 41-3, p. 152). In late October 2011, Plaintiff reported

to her supervisors and others what she believed was a case of student neglect after observing another teacher tending A. D., a young, female student who was crying and whose vaginal and rectal areas were bloody and unclean. On November 1, 2011, Plaintiff reported signs of biting insects, which were possibly fleas, in A. D.'s hair. Soon after this report, Principal Davis confronted Plaintiff and, visibly upset, told her to stop making reports of suspected abuse or neglect to the school counselor and to report such cases only to him. (Ex. 7 to depositions, Doc. 42-1; Declaration of Plaintiff, Ex. 5 to Plaintiff's Response to DSMF, Doc. 32-3, ¶10; Declaration of Alexis Smith Hughes, Ex. 4 to Plaintiff's Response to DSMF, Doc. 32-3, ¶6). Davis also told Chappuis about A. D.'s bleeding. (Deposition of Katie Chappuis, Doc. 41-4, pp. 123–26).

During the 2011–2012 school year, state law required teachers at Mason Elementary School who had "reasonable cause to believe that a child ha[d] been abused [to] report … that abuse" and to "notify the person in charge of the facility, or the designated delegate thereof." O.C.G.A. §§ 19-7-5(c)(1)–(2) (2011). This legal duty was also set out in the School District's policy and the protocols in place at the Mason Elementary School. (Board Policy on Child Abuse or Neglect, Ex. 6 to depositions, Doc. 42-1; Child Abuse Reporting Protocol, Ex. 32 to depositions, Doc. 42-3; Davis Depo., pp. 79–83). Principal Davis was the person in charge of the elementary school, and he had designated a number of

individuals as persons to whom abuse reports could be made, including the assistant principals, the school's nurse, and the school's counselor. Georgia law requires that once a report of abuse is made to a principal or a designated delegate, then the Georgia Division of Family and Children Services ("DFCS") must be notified of the report. (Id. at 73–78, 82). The School District mandated that the school administrator or the reporter also immediately notify the school's counselor and social worker, who would report the suspected abuse to DFCS. (Child Abuse Reporting Protocol).

After being corrected by Principal Davis, Plaintiff also received a formal written warning from Assistant Principal Diaz on November 15, 2011 for being late to her duty station. Although Chappuis was the assistant principal responsible for supervising Plaintiff's teaching during the 2011–2012 school year, Diaz supervised Plaintiff in her non-teaching duties, which involved monitoring a particular hall when students arrived in the morning and required her to be at her post at 7:40. (Deposition of Plaintiff, Doc. 41-1, pp. 43, 52–54). On November 15, Diaz issued the warning to Plaintiff for being tardy to her post and failing to let her assigned contact person at the school know that she would be late. Diaz informed Plaintiff of the reasons for the warning and said that he would leave the warning in her box for her signature and any comments she might have. (Warning, Ex. 21A to depositions, Doc. 42-1; Plaintiff's 11/17/11 Memo, Ex. 21G

to depositions, Bates-stamped D 511, Doc. 42-1; Plaintiff's 12/1/11 Email, Ex. 21K to depositions, Bates-stamped D 509, Doc. 42-1). On the form, Diaz had indicated that this was her second warning for tardiness. The warning notice had a place for Plaintiff to mark whether she agreed or disagreed with Diaz's description of her behavior, and it had a signature line showing that she had read and understood the warning notice. Because this was the first warning Plaintiff had received that school year, she delayed on signing the document until she could speak with a representative from the teachers' union. (Plaintiff Depo., pp. 110–13, 120–22; Plaintiff Declar., ¶11).

On November 17, Diaz entered Plaintiff's classroom and demanded that she immediately sign the warning notice. When Plaintiff said that she did not have time to discuss the warning because she was in the middle of preparing to meet with students' parents concerning Individualized Education Plans ("IEPs") for the students, Diaz became irate, raised his voice, and threatened to force her to sign and return the form by the end of the day, saying that she could attach any comments later. Plaintiff insisted that she would only sign the form when she was prepared to attach her comments. (Id.; Hughes Declar., ¶¶7–8).

Diaz informed Davis and Chappuis of this conversation. On November 30, 2011, Diaz emailed Plaintiff, copying Davis and Chappuis on the email, informing her that on that day he had placed the warning in her personnel file with "refusal

6

NAV

to sign" written on the form. In the email, Diaz wrote that on November 15 he had placed the warning in Plaintiff's box and that he had told her she had five days in which to attach comments to the warning. He wrote that on "November 16th, 2011" he had requested Plaintiff to return the warning with her signature. According to Diaz, Plaintiff had persisted in refusing to do so because she did not want to sign the form until she could submit her comments, even though Diaz reminded her that she had five days in which to attach them. (Diaz's 11/30/11 Email, Ex. 21J to depositions, Bates-stamped D 511, Doc. 42-1).

The next day, December 1, 2011, Plaintiff replied to Diaz's email, copying Davis and Chappuis on her response. She denied that on November 15 Diaz had told her that she had five days to add comments to the warning. She also corrected him by noting, accurately, that their conversation in her classroom had occurred on November 17. More importantly, she described Diaz as having acted "in a very unprofessional manner," raised his voice, engaged in an "unprofessional tirade," and demanded that she "sign a statement that was factually incorrect." Plaintiff wrote that her students, her teaching assistants, and a college intern were present during Diaz's outburst. (Plaintiff's 12/1/11 Email). Davis never investigated the incident. (Davis Depo., pp. 192–94). Under the School District's policies, a principal should investigate a teacher's complaints that an assistant principal behaved in such an unprofessional, disrespectful

manner as Diaz did. (Deposition of William Cason, Doc. 41-2, pp. 29–40; Deposition of Sheila (Mason) Lawson, Doc. 41-5, pp. 61–66).

Under the evaluation method used by the School District for the 2011–2012 school year, school administrators were required to conduct at least three formal, unannounced observations of all teachers who had less than three years of teaching experience. (GTEP Evaluation Manual, Ex. 24–25 to depositions, Doc. 42-2, p. 5; Cason Depo., pp. 77–79). At that time, the School District was using the Georgia Teacher Observation Instrument ("GTOI") to assess teachers' classroom performances and the Georgia Teacher Evaluation Program ("GTEP") for the annual evaluations of the teachers. (Id. at 8, 17, 40–44). These tools were used to appraise both regular and special education teachers. Under the GTOI, before observing a teacher an administrator was required to be fully informed and prepared so that the teaching performance could be fairly critiqued in light of the teacher's objectives. (Lawson Depo., pp. 16–20). One aspect of assessing special education instructors was determining whether their students were progressing in the students' individual education programs, or IEPs. (Cason Depo., pp. 48–50). To ensure a fair outcome under the GTOI and the GTEP, the teachers had the right to unbiased observations and evaluations. (Id. at 78).

On December 7, 2011, Chappuis conducted a formal, unannounced observation of Plaintiff's teaching. Prior to observing Plaintiff, Chappuis did not

review all of the IEPs for Plaintiff's students, so the assistant principal did not know what the goals and objectives of Plaintiff's teaching were on the day of the observation. (Chappuis Depo., pp. 13–31, 141–46). Out of the eleven categories on the evaluation form used by Chappuis for the observation, she rated Plaintiff as needing improvement in three areas: instructional level, building for transfer, and use of time. (12/7/11 Observation, Ex. 9 to depositions, Doc. 42-1).

After this observation, Plaintiff continued reporting possible abuse of her students. On January 2, 2012, Plaintiff told Chappuis and the school nurse that A. D. had fleas in her hair and emitted a strong smell of animals. Some ten days later, Plaintiff reported to Chappuis and the nurse that a different student, C. T., exhibited a protruding abdomen, yellowish-brown coloration of the skin, and watery stools. (Attachment C to Plaintiff's Responses to Defendants' Interrogatories, Ex. 1 to Plaintiff's Response to DSMF, Doc. 32-2; Plaintiff Declar., ¶15).

On February 1, 2012, Diaz conducted another formal observation of Plaintiff. (2/1/12 Observation, Ex. 10 to depositions, Doc. 42-1). From the beginning of the 2011–2012 school year until this observation, Diaz had reviewed some of the IEPs for Plaintiff's students, but there is no evidence that he reviewed the IEPs specifically in preparation for observing Plaintiff. (Deposition of Francisco Diaz, Doc. 41-7, pp. 23–27). Diaz noted on the evaluation form that

Plaintiff needed improvement in three areas: instructional level, building for transfer, and supporting students. Thus, Plaintiff had a total of six "needs improvement" assessments from her first two observations in the 2011–2012 school year. (Davis Depo., pp. 212–13).

The School District's teacher evaluation program required that a school attempt to remediate a teacher's deficiencies if she received five or more "needs improvement" ratings in a particular school year. The school administration had to place the teacher into an extended phase evaluation process to further scrutinize her performance. The evaluation policy directed administrators to hold a conference with the teacher and attempt to craft a professional development plan that would improve the teacher's work. (GTEP Evaluation Manual, p. 9; Cason Depo., pp. 73–78, 89–90; Lawson Depo., pp. 20–25; Davis Depo., pp. 212–15;). Despite the policy's clear guidelines, Plaintiff was never placed on an extended phase evaluation, a remediation conference was never held, and she was not offered a professional development plan. (Id. at 204–06, 213–16).

In December 2011 and on January 20, 2012, Diaz gave Principal Davis memoranda claiming that he had video recordings from the school's security cameras showing that Plaintiff was late to her duty station on December 6, January 18, and January 19. The memorandum relating to December 6 states that the "video clip has a three minute delay from actual school time." (December

2011 Memo, Ex. 21L to depositions, Bates-stamped D 508, Doc. 42-1; 1/20/12 Memo, Ex. 21N to depositions, Bates-stamped D 506, Doc. 42-1; Diaz Depo., pp. 214–19). Plaintiff did not learn about Diaz's memoranda or the video recordings until after the non-renewal decision. She denies that she was late on the dates in question, contends that the time on the recordings from the security camera was faster than the school's clock, and provides evidence that the woman in some of the videos was her sister, who also worked at the school.[1] (Plaintiff Declar., ¶14; Declaration of LaShaundra McGhee, Ex. 31 to Plaintiff's Response to DSMF, Doc. 32-4, ¶9). Prior to making the recommendation that Plaintiff's contract not be renewed, Principal Davis never reviewed the video recordings. (Davis Depo., pp. 166–68; Diaz Depo., pp. 216–19).

From February 13 through March 19, 2012, Plaintiff continued reporting possible abuse of her students. (Plaintiff Declar., ¶15). Plaintiff was still observing fleas and the smell of an animal on A. D., which Plaintiff repeatedly brought to the attention of Principal Davis and Chappuis. (Ex. 29 to Plaintiff's Response to DSMF). Plaintiff also related continuing concerns over C. T. He had developed a rash on his bottom, and his parents were not providing him with pull-ups to use at school. (Ex. 20, 33 to Plaintiff's Response to DSMF).

---

[1] The Court has reviewed the video recordings (Ex. 15 to Plaintiff's Response to DSMF) and cannot tell whether Plaintiff appears in them or not.

On March 19, 2012, Principal Davis and Chappuis met with Plaintiff to express concerns over how she was handling confidential information about her students. Chappuis accused Plaintiff of telling a student's parent that A. D. had brought fleas into the classroom. Chappuis raised her voice and was verbally aggressive during the conversation. Becoming upset, Plaintiff denied the accusation and said that she had only told the parent that there was a "situation" in the classroom and suggested speaking with Chappuis. Frustrated that there were still fleas on her students despite her multiple reports, Plaintiff told Chappuis that she "had to be the voice for my students or no one else would." (Plaintiff Declar., ¶16). Following the meeting, Chappuis wrote a memorandum providing her account of the conversation and the events leading up to it, and she gave a copy of the memorandum to Principal Davis. (Chappuis Depo., pp. 176–85). Both administrators signed the memorandum. According to Chappuis, "in the discussion with [Plaintiff] I stated that it had been brought to our attention that there had been made statements that she was not satisfied with how we chose to handle the flea situation. I also stated that … I did feel as though she had not been satisfied with the result of how the situation (child with fleas) had been addressed…." (Chappuis's Memo, Ex. 41 to depositions, Doc. 42-3).

On March 22, Principal Davis recommended, in a memorandum to the School District's human resources director, that Plaintiff's contract not be

renewed. (3/22/12 Memo, Ex. 19 to Plaintiff's Response to DSMF, Doc. 32-3). In support of the recommendation, Davis submitted documents from Plaintiff's personnel file that included, among other things, the assessment forms from two observations of Plaintiff; the annual evaluations of Plaintiff from the two previous school years; emails and memoranda about Diaz's warning to Plaintiff for allegedly being tardy on November 15, 2011; Chappuis's memorandum about the conversation with Plaintiff on March 19, 2012; and Diaz's memorandum concerning the video recordings. These documents were provided to Superintendent Cason. (Ex. 76 to depositions, Doc. 42-7; Cason Depo., pp. 80–83). Principal Davis also spoke with the superintendent around March 26 and said that Plaintiff's performance as a teacher had declined and that she was increasingly difficult to manage. (DSMF, ¶19).[2]

Superintendent Cason was responsible for deciding whether to accept the principal's non-renewal recommendation. The superintendent was required to submit the name of any teacher whose contract he wanted to renew to the School District's Board of Education for approval. (Declaration of Superintendent Cason, Doc. 28-3,  ¶¶8,  11). In weighing Plaintiff's employment fate, Superintendent Cason relied on the accuracy of the information contained in the documents sent by Principal Davis. (Cason Depo., pp. 81–82, 99–101). Agreeing

---

[2] Plaintiff denies this fact, but she has not provided evidence to controvert it, as required by Local Rule 56. Principal Davis's affidavit provided in support of this fact does not, as Plaintiff argues, conflict with his deposition testimony.

with the decision not to renew Plaintiff's contract, the superintendent did not provide Plaintiff's name to the board of education for approval. On March 29, the School District's human resources director emailed Principal Davis to let him know that his recommendation had been accepted. (DSMF, ¶¶21–23).

Meanwhile, on March 27, Chappuis conducted a third observation of Plaintiff for the 2011–2012 school year. The assistant principal marked Plaintiff as needing improvement in four areas. (Ex. 11 to depositions, Doc. 42-1). Before Plaintiff received a copy of the assessment form from the March 27 observation, she was given her annual evaluation on March 29. The evaluation, which was signed by Chappuis and Principal Davis, described Plaintiff's performance as "unsatisfactory." (2011–2012 Annual Evaluation, Ex. 12 to depositions, Doc. 42-1; Plaintiff Depo., pp. 79–82). When Plaintiff asked Principal Davis about the evaluation, he said that he did not know why she had been given an unsatisfactory rating and that she would have to ask Chappuis. Plaintiff had a conference with the principal and assistant principal on April 11, and Chappuis told her that she had been given a poor evaluation because of her tardiness. (Id. at pp. 79–86).

On April 23, 2012, Plaintiff learned for the first time that her contract had not been renewed. She received a letter from Superintendent Cason informing her of this fact, and she also had a conversation with Principal Davis. Plaintiff

asked the principal for information on how she could improve her performance, but he never told her. (Plaintiff Declar., ¶22; 4/23/12 Letter, Ex. 16 to depositions, Doc. 42-1).

Plaintiff filed a lawsuit in this Court on April 19, 2013. She has sued Katie Chappuis, Principal John Davis, Superintendent William Cason,[3] and the Valdosta City School District (collectively "Defendants"). She alleges that Defendants unlawfully retaliated against her in violation of the Americans with Disabilities Act, 42 U.S.C. § 12203 ("ADA"); the Rehabilitation Act of 1973, Section 504, 29 U.S.C. § 794 ("Rehab Act"); and the Georgia Whistleblower Act, O.C.G.A. § 45-1-4. According to Plaintiff, over the course of several months Defendants punished her for reporting suspected child abuse of her students by giving her bad performance reviews, inventing accounts of her tardiness and insubordination, and recommending her non-renewal for trumped-up reasons. (Amended Complaint, Doc. 4, ¶¶12–50). Plaintiff also alleges that Chappuis and Principal Davis are liable for intentional infliction of emotional distress, evidently based on the manner in which they rebuked her. (Id. at 51–56).

---

[3] Plaintiff sues Superintendent Cason and Chappuis in both their individual and official capacities. Principal Davis has been sued in his individual capacity only. It is well established that an official-capacity claim is really nothing more than a claim against the entity employing the individual defendant, so where the entity has been made a party to the lawsuit, the official-capacity claim should be dismissed as redundant. See Kentucky v. Graham, 473 U.S. 159, 165–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); Griswold v. Ala. Dep't of Indus. Relations, 903 F. Supp. 1492, 1497 (M.D. Ala. 1995). Therefore, the Court dismisses the official-capacity claims.

**C.    Analysis**

Defendants' motion for summary judgment is granted in part and denied in part. The undisputed factual record shows that questions of fact remain with regard to Plaintiff's retaliation claims against Principal Davis, Chappuis, and the School District. However, the intentional infliction of emotional distress claim is dismissed, as well as all of the claims against Superintendent Cason.

### 1.    Retaliation Claim under the ADA and the Rehab Act

Summary judgment is denied with regard to Plaintiff's claim that Principal Davis, Chappuis, and the School District violated the anti-retaliation provisions of the ADA and Section 504 of the Rehab Act. However, summary judgment is granted on the retaliation claim against Superintendent Cason.

Because Plaintiff alleges that she suffered retaliation for demanding that equal access to public services be afforded to her disabled students, *i.e.*, she reported suspected abuse and neglect to protect their welfare, her claim falls under Title II of the ADA. *See* Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1166 n. 5 (11th Cir. 2003). Under Title II, individual defendants such as Chappuis, Principal Davis, and Superintendent Cason may be liable for retaliation, *see* id. at 1179–80, and a plaintiff is not required to exhaust her administrative remedies before filing suit. Bledsoe v. Palm Beach Cnty. Soil & Water Conserv. Dist., 133 F.3d 816, 824 (11th Cir. 1998). Furthermore, "[c]laims

under Section 504 [of the Rehab Act] are subject to the same legal framework as ADA claims." Wilbourne v. Forsyth Co. Sch. Dist., 306 F. App'x 473, 476 (11th Cir. 2009) (per curiam) (addressing a retaliation claim under the ADA by a teacher who had reported abuse of a student). Moreover, because the ADA's anti-retaliation provision is "similar to Title VII's prohibition on retaliation," retaliation claims brought under the ADA and Section 504 are analyzed in the same way as Title VII retaliation claims. Id. at 475–76 (internal quotation and citation omitted). Establishing a *prima facie* retaliation claim thus requires Plaintiff to show: "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action." Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1328 (11th Cir. 1998); *see also* Shotz, 344 F.3d at 1180.

In cases such as this one, where the plaintiff does not bring forward direct evidence of retaliation, the court must analyze the claim using the familiar burden-shifting framework for retaliation cases. *See* Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010); *see also* Wilbourne, 306 F. App'x at 475–76. A plaintiff must first establish a *prima facie* case of retaliation. Johnson v. Booker T. Washington Broad. Servs., Inc., 234 F.3d 501, 507 n. 6 (11th Cir. 2000). If she is able to do so, the burden shifts to the defendant to provide a non-retaliatory reason for the adverse employment action.

Id. Assuming such a reason is provided, the plaintiff must address the proffered reason head on and rebut it, showing that it was merely pretext for retaliation. Id. At all stages of the analysis, the burden of persuasion rests on the plaintiff. Alvarez, 610 F.3d at 1264.

Plaintiff is able to establish a *prima facie* case of retaliation against Defendants. Plaintiff's reports of abuse provide the first element of a retaliation claim. *See* Whitehead By and Through Whitehead v. Sch. Bd. for Hillsborough Cnty., Fla., 918 F. Supp. 1515, 1522 (M.D. Fla. 1996) ("retaliatory acts [by recipients of federal funds] are prohibited against persons who complain of unlawful discrimination in violation of § 504 on behalf of a handicapped individual"). There is also evidence for the second element of the *prima facie* case. The non-renewal of Plaintiff's contract was certainly an adverse employment action, but so were the negative results of Chappuis's observations of Plaintiff, the critical annual evaluation, and Principal Davis's recommendation that Plaintiff's contract not be renewed. *See* Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008) (noting that an "unfavorable performance review … clearly might deter a reasonable employee from pursuing" a protected activity).

Plaintiff has also been able to show a causal link between the adverse actions and her reports of abuse, supplying the third element of the *prima facie* case. Plaintiff need only show that her reports and the adverse actions were "not

completely unrelated." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (internal quotation and citation omitted). A plaintiff can demonstrate *prima facie* causality by establishing a defendant's knowledge of the protected activity and close temporal proximity between the activity and the purported retaliation. Id. There is evidence that on March 19, 2012 Principal Davis and Chappuis knew of Plaintiff's reports that her students were continuing to experience abuse and neglect. Within two weeks from that date, Principal Davis recommended that Plaintiff's contract not be renewed, and Chappuis gave her a poor assessment after an observation and a negative annual evaluation. As for Superintendent Cason, the materials provided to him for review before deciding on whether to renew Plaintiff's contract included multiple references to recent reports she had made about child abuse. A jury could, thus, reasonably infer from these circumstances that he thus had notice of her reports. Since the causal link has been made with regard to the individual Defendants, causality has been shown for the School District as well.

Now turning to see if Defendants have offered legitimate reasons for the adverse actions taken against Plaintiff, the Court is convinced that they have. They do not have to convince the Court that they were actually motivated by these reasons but only that a reasonable jury could find that they were not retaliating against Plaintiff. *See* Combs v. Plantation Patterns, 106 F.3d 1519,

1528 (11th Cir. 1997). Defendants assert that they gave Plaintiff poor ratings and evaluations as a teacher and finally decided not to renew her contract because she was a bad teacher, she could not get along with other teachers and the school administration, she was tardy to work, and she was insubordinate. (Packet for Dep't of Labor, Ex. 75 to depositions, Doc. 42-7, p. 1; Lawson Depo., pp. 72–75; DSMF, ¶¶19–21). There is unquestionably some evidence in the record that Plaintiff's performance at Mason Elementary School suffered from these deficiencies. These would certainly be valid reasons for Defendants' actions, so they have met their burden.

The burden now shifts to Plaintiff to call into question whether Defendants' proffered explanations are only masks for retaliation. Plaintiff must meet each of the Defendants' reasons head on and rebut it. *See* Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1308 (11th Cir. 2007). She must do so "either directly by persuading the court that a [retaliatory] reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Evidence of pretext may be found in "an employer's failure to articulate clearly and consistently the reason for an employee's discharge" as well as in "an employer's deviation from its own

standard procedures." Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298–99 (11th Cir. 2006).

There is a question of fact for whether Chappuis's stated reasons for giving Plaintiff a poor annual evaluation and assessing "needs improvement" ratings on the observations were merely pretexts for retaliating against the teacher for reporting suspected child abuse. Chappuis claims that Plaintiff's performance as a teacher in the 2011–2012 school year was deficient. However, Plaintiff's teaching had been deemed satisfactory in the two preceding school years, and many of Plaintiff's students in 2011–2012 were progressing in their IEPs, which is one means of determining how well a teacher is performing. When Plaintiff had asked the assistant principal why her contract would not be renewed, the answer was her tardiness to work, not her deficiencies in the classroom. Furthermore, Chappuis never offered Plaintiff a professional development plan after she received more than five "needs improvement" ratings, which was required by the School District's policy to assist poorly performing teachers.

Plaintiff has also created a question of fact for whether Principal Davis's stated reasons for not renewing Plaintiff's contract were actually covers for retaliation. The principal asserts that he recommended non-renewal because Plaintiff supposedly had trouble getting along with others at the school, was tardy to work, and was a poor teacher. With regard to Plaintiff's supposed uncongenial

attitude, Defendants have offered little evidence for specific instances of Plaintiff's difficult behavior. Diaz does claim that Plaintiff responded defensively and disrespectfully when he confronted her about signing the warning for being tardy, but both Plaintiff and a witness state that it was actually Diaz who was rude and unprofessional. Principal Davis knew about the personality conflict between Plaintiff and Diaz but never investigated Plaintiff's account for what had occurred, something that Superintendent Cason testified should have been done. The principal also took Diaz's word concerning Plaintiff's tardiness, not even bothering to check sign-in sheets or watch the video recordings even though Diaz told him there was a discrepancy between the time recorded on the security camera and the school's clock. Thus, a jury could conclude that the principal used the allegations of insubordination and tardiness as pretexts for ending Plaintiff's employment after her repeated reports of abuse.

A reasonable jury could also question whether Plaintiff's deficiencies as a teacher were really what led Principal Davis to recommend non-renewal of her contract. The principal testified in his deposition that he concluded Plaintiff's performance had declined based on his own informal walk-throughs while Plaintiff was teaching, conversations with the assistant principals, and the formal observations of Plaintiff. However, Plaintiff denies that the principal ever informally observed her classroom, and he admits that he cannot recall how often

he came into her classroom or what he saw in Plaintiff's teaching that concerned him. Moreover, while knowing of the tension between Diaz and Plaintiff, the principal allowed Diaz to do a formal observation of Plaintiff, which a jury might reasonably perceive as compromising the integrity of the observation. As with Chappuis, a jury might also conclude from Principal Davis's violation of the School District's policies by not proposing remediation to Plaintiff that he did not view her as being a poor teacher and only claimed that as an excuse to retaliate against her. The fact that the principal recommended non-renewal even before Chappuis had done the third observation of Plaintiff or completed the annual evaluation of the teacher also supports such a conclusion.

Although Plaintiff has raised questions of fact with regard to Chappuis's and Principal Davis's motives, she has not done so for Superintendent Cason. There is no evidence that the superintendent was angered by Plaintiff's reports of child abuse, in fact the only evidence he even knew of such reports is a reference to them in the materials submitted with the non-renewal recommendation. The superintendent was supplied with information from the principal and assistant principals at Plaintiff's school that she was a poor teacher, that she arrived late to school, and that she had a difficult attitude. Unlike Chappuis and Principal Davis, there is no evidence Superintendent Cason departed from the School District's policies or otherwise rigged the evaluations of

Plaintiff's work. A jury thus has no grounds for disbelieving what the superintendent says were his reasons for deciding not to renew Plaintiff's contract, regardless of whether Plaintiff was in fact a poor teacher, tardy, or insubordinate. *See* Alvarez, 610 F.3d at 1266. The retaliation claim against the superintendent must be dismissed because Plaintiff has not carried her burden of producing evidence that his proffered explanations were pretexts for retaliation.

Even though summary judgment is granted on the retaliation claim against Superintendent Cason, it is denied on the retaliation claim against the School District. On multiple occasions a panel of the Eleventh Circuit has applied Title VII retaliation cases as precedent for cases, such as this one, involving retaliation claims under the ADA and Section 504. *See* Wilbourne, 306 F. App'x at 475–76; Shotz, 344 F.3d at 1180–81. In what has come to be known as the "cat's paw" theory,[4] courts have held in Title VII cases that employers may be held liable for retaliation even if the titular decisionmaker had no retaliatory motives if "the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999) (applying the theory to a Title VII discrimination claim); *see also* Pennington v. City of Huntsville, 261 F.3d 1262, 1270 (11th Cir. 2001) (applying the same analysis to a Title VII retaliation

---

[4] In *Staub v. Proctor Hospital*, the Supreme Court described the colorful history of this term as used in federal jurisprudence. ___ U.S. ___, 131 S.Ct. 1186, 1190 n. 1, 179 L.Ed.2d 144 (2011).

claim). In such circumstances, the official decisionmaker is merely the conduit, or "cat's paw," of the recommender's unlawful animus, so the employer is still liable for the recommender's retaliation. Stimpson, 186 F.3d at 1332.

Applying the "cat's paw" theory to Plaintiff's claims under the ADA and Section 504 shows that a question of fact remains for whether the School District is liable for retaliation. Superintendent Cason was charged with the ultimate authority for deciding whether to submit Plaintiff's name for approval by the board of education, a pre-condition for renewing her contract. When viewed in Plaintiff's favor, the record shows that the superintendent did nothing to verify the information provided to him by the administrators at Mason Elementary School. He never undertook an observation of Plaintiff in her classroom. He did not speak with her about her reports of child abuse or her interactions with the administrators. The School District would have been shielded from liability on the retaliation claims if Superintendent Cason had independently investigated and confirmed the criticisms of Plaintiff, for then the non-renewal decision would have been untainted by Principal Davis's and Chappuis's retaliatory motives. See Pennington, 261 F.3d at 1270-71. Because he did not do so, a jury could reasonably conclude that he was nothing more than a "cat's paw," and summary judgment is denied on the retaliation claims against the School District.

### 2.     Claim under the Georgia Whistleblower Act

Plaintiff also alleges that Defendants violated the anti-retaliation provision of the Georgia Whistleblower Act. To make out a *prima facie* case of retaliation under the statute, "the employee must present evidence that (1) the employer falls under the statute's definition of 'public employer'; (2) the employee disclosed 'a violation of or noncompliance with a law, rule, or regulation to either a supervisor or government agency'; (3) the employee was then discharged, suspended, demoted, or suffered some other adverse employment decision by the public employer; and (4) there is some causal relation between…" the disclosure and the employment action. Forrester v. Ga. Dep't of Human Servs., 308 Ga. App. 716, 722, 708 S.E.2d 660, 666 (2011) (quoting and citing O.C.G.A. § 45-1-4(a)). Georgia courts have looked to federal jurisprudence on retaliation claims to determine whether the causal link has been established, which is the only element Defendants claim Plaintiff has not established. *See, e.g.*, Freeman v. Smith, 324 Ga. App. 426, 428–31, 750 S.E.2d 739, 741–43 (2013); Forrester, 308 Ga. App. at 721–22, 708 S.E.2d at 665–66. Therefore, the Court's analysis of the retaliation claims under the ADA and Section 504 also applies to the retaliation claim under the Georgia Whistleblower Act. Summary judgment is granted for the state retaliation claim against Superintendent Cason but denied with respect to the other Defendants.

### 3.   Intentional Infliction of Emotional Distress Claim

The motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress is granted. To establish this claim, Plaintiff is required to produce some evidence for each of "the following elements: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress must be severe." Udoinyion v. Re/Max of Atlanta, 289 Ga. App. 580, 584, 657 S.E.2d 644 (2008). To qualify as sufficiently "extreme and outrageous," the behavior "'must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Id. (quoting Kaiser v. Tara Ford, Inc., 248 Ga. App. 481, 488, 546 S.E.2d 861 (2001)). Conduct does not rise to this level merely because it is unkind or hurts someone's feelings. Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1229 (11th Cir. 1993). Whether behavior is "extreme and outrageous" is "a question of law governed by an objective standard: the evidence must show that reasonable persons might find the presence of extreme and outrageous conduct." Id.

No reasonable jury could find the Defendants' actions to have been extreme and outrageous. While Plaintiff did weep on different occasions when Principal Davis and Chappuis raised their voices in rebuking her, such insults

and indignities of everyday life, if Defendants' actions even qualify as such, do not constitute extreme and outrageous conduct. *See* Moses v. Prudential Ins. Co. of Amer., 187 Ga. App. 222, 225, 369 S.E.2d 541 (1988). Nor would anything else the Defendants did be considered intolerable by a civilized society. Giving an employee a poor evaluation and informing her that her contract would not be renewed might be humiliating for the employee, but such actions are insufficient to establish an intentional infliction of emotional distress claim. *See* Clark, 990 F.2d at 1229 (noting that "an employer's termination of an employee—however stressful to the employee—generally is not extreme and outrageous conduct").

## II.   Motion to Exclude Testimony from Delvin-Brown

The Court now turns to Defendants' Daubert motion to exclude the testimony of Dr. Angela Delvin-Brown ("Delvin-Brown"), Plaintiff's proposed expert. In analyzing this motion, the Court has reviewed Delvin-Brown's amended expert report (Doc. 26-1),[5] her curriculum vitae ("CV") (Doc. 29-1, pp. 16–25), and her declaration in opposition to Defendants' motion for summary judgment (Ex. 30, Doc. 32-4). What is not included in the record is a deposition of Delvin-Brown, because Defendants' attorney chose not to depose her. Thus, the

---

[5] The amended expert report is dated March 31, 2014, which is several weeks after the deadline by which Plaintiff was to have served supplemental reports to Defendants. (See Order, Doc. 22). Because Defendants have not objected to the report's being untimely and the Court is not aware what, if any, substantive differences exist between the original report and the amended version, at this time the Court will not exclude the report simply because it fails to comply with the discovery deadlines.

Court has limited information to use in assessing the arguments raised by Defendants' Daubert motion.

### A.    Standard for <u>Daubert</u> Motions

Under the standard for testing proposed expert testimony, Plaintiff has the burden of establishing, by a preponderance of the evidence, a foundation for admitting Delvin-Brown's testimony. *See* Corvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1256 (11th Cir. 2002). Whether Delvin-Brown's opinions qualify as expert testimony depends on if: (a) her "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Court must act as a "gatekeeper" to determine whether any of Delvin-Brown's opinions meet this standard. *See* Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589–90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In this role, the Court must engage in a "rigorous three-part inquiry" and ask whether: 1) Delvin-Brown is qualified to competently testify regarding the matters for which she offers an opinion; 2) her methodology is sufficiently reliable under the Daubert standard; and 3) her testimony would assist the jury, through the application of scientific, specialized, or technical expertise, to determine a fact in

issue or understand the evidence. *See* <u>United States v. Fazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004).

**B.    Delvin-Brown's Opinions**

Delvin-Brown offers four opinions as expert testimony. The Court will do its best to summarize her opinions despite the loose, rambling structure of her report. First, if allowed, Delvin-Brown would testify that the distinct demands of special education dictated how Plaintiff taught her students, who varied in their abilities and ages. Second, Delvin-Brown would relate that the Mason Elementary School administrators did not properly administer the GTOI observations of Plaintiff because they were not familiar with the students' IEPs or the challenges created by their particular needs. A special education teacher should be evaluated in terms of the progress her students are making in their IEPs, and Plaintiff's students demonstrated such progress. Third, Delvin-Brown would opine that the "needs improvement" ratings assigned to Plaintiff were based on expectations for how a class with non-disabled students functioned, rather than a special education class like Plaintiff's. Thus, the "needs improvement" ratings Plaintiff received do not accurately describe her teaching performance. Fourth, Delvin-Brown would state that Plaintiff seemed to understand her job duties and the needs of her students, that they made

progress under her teaching, and that she "was a strong advocate for the needs of her students…." (Amended Expert Report, pp. 13–15).

### C.     Delvin-Brown's Qualifications

Delvin-Brown is qualified to offer these opinions. She has undergraduate, master's, and doctorate degrees in education. Since 1991 she has served as a private educational consultant providing training and evaluation to teachers and administrators on various topics including differentiated instruction, instructional modifications for general classroom teachers, special education, teaching and learning strategies, special education transition services, and IEP development. She has taught courses in special education at multiple universities. From 1981–1991, Delvin-Brown was a consultant for the Georgia Department of Education in areas such as policy development and implementation, state and federal regulations, monitoring, and creation of training manuals. She developed the IEP resource guide for the Georgia Department of Education and has published and given presentations on teacher assessment, teacher training, and special education. In sum, Delvin-Brown is highly qualified to serve as an expert witness for how to teach special needs students and how to evaluate special education instructors.

**D.      The Reliability of the Opinions**

The Court also finds Delvin-Brown's opinions to be largely reliable. Her criticisms of the negative ratings given to Plaintiff are not speculative, for they are based on internal inconsistencies in how the Mason Elementary School administrators assessed the teacher's strengths and weaknesses, testimony of what was actually occurring in Plaintiff's classroom during the observations, testimony from the administrators, and documents in the record. Certainly Delvin-Brown may not testify, as though she were an eyewitness with first-hand knowledge, that Plaintiff was or was not doing some specific thing during the formal observations. However, if the proposed expert is provided with evidence for what Plaintiff was doing, she may testify as to whether that behavior was appropriate in the context of Plaintiff's class. Delvin-Brown would, thus, also be allowed to testify concerning whether measuring student progress in IEPs is a proper way to gauge a teacher's performance, whether the evidence indicates Plaintiff's students did make such progress, and what this progress would suggest about Plaintiff. Such commentary on the significance of evidence is not speculation, but rather the hallmark of expert testimony.

Certain minor points in Delvin-Brown's opinions are speculative. The expert report concludes by noting that Plaintiff "appears … to be able to manage staff who worked under her supervision and who at least in some cases lacked a

32

high degree of knowledge and training in the area of young children with…" special needs. (Amended Expert Report, p. 15). It goes on to state that Plaintiff "appeared to understand her primary duties to her students and their health and safety." (Id.) The Court is unclear upon what precisely Delvin-Brown is basing these conclusions concerning Plaintiff's management abilities, the limited knowledge and training of her staff, and her understanding of her duties. Such broad, conclusory statements are excluded, subject to Delvin-Brown's establishing a more concrete foundation for them while testifying at trial.

Defendants also argue, unconvincingly, that Delvin-Brown's opinions are unreliable because she has not disclosed what, if any, scientific method she used to reach them. Even if no scientific testing or methodology is involved, expert testimony may be reliable if it is based on education, experience, or training. _See_ Frazier, 387 F.3d at 1261–63. If a witness primarily bases her opinions on her experience, then she must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Id. at 1261 (quoting the advisory committee's notes to Fed. R. Evid. 702) (emphasis omitted). The standard for judging the reliability of a witness's opinion is necessarily flexible, involving factors which may vary from case to case. Id. at 1261–62.

Although Delvin-Brown could have more clearly demonstrated how her experience, training, and education formed her opinions, the Court is persuaded that a preponderance of the evidence supports the reliability of her conclusions. She claims to have experience in the areas in which she has opined. According to Delvin-Brown's declaration, her opinions in this case "are similar in content, approach and scope with opinions or training or consulting that I might give to school districts or in instruction when teaching classes or workshops." (Delvin-Brown Declar., ¶3). Her CV describes an impressive history of working in general and special education, developing IEPs for special needs students, employing tools for evaluating teachers, and ensuring compliance with state and federal laws and regulations. Her report makes clear that, in arriving at her conclusions, she has applied this experience and training, along with a variety of resources from the special education arena, to the facts of this case. If Defendants wished to clarify certain details for how Delvin-Brown engaged in this process, they should have deposed her.

### E.    The Opinion's Usefulness to the Jury

Contrary to Defendants' assertion, Delvin-Brown's testimony would assist the jury in trying the facts of this case. Defendants are correct that what is ultimately at issue is whether they intended to retaliate against Plaintiff, not the wisdom of the evaluations, observations, and decision not to renew her contract.

However, this fact does not render irrelevant Delvin-Brown's opinions on how the evaluation tools were implemented, how the Defendants may have ignored the clear guidelines of the School District's evaluation policy, and whether Plaintiff's students showed progress in their IEPs. A jury's determining that these things did occur would not be sufficient to render the Defendants liable for retaliation, but it would certainly buttress Plaintiff's argument that Defendants created the canard of her incompetence to cover their retaliation. Furthermore, these topics do not come within the average layperson's knowledge. As for Defendants' concern that the jury might be misled into thinking that Plaintiff has proven her case simply by convincing the jury that Delvin-Brown's conclusions are true, the jury's own common sense and clear instruction from the Court will dispel this threat.

A minor conclusion reached by Delvin-Brown is irrelevant. She maintains that the GTOI observation instrument was a poor means of measuring a teacher's performance, particularly one in special education. Even if this is true, the Court fails to see how this fact would make it more or less likely that Defendants retaliated against Plaintiff. The administrators at Mason Elementary School used the GTOI tool to assess Plaintiff's performance in the 2009–2010 school year, well before they allegedly began their retaliation. (See 4/14/10 Observation, Ex. 3 to depositions, Doc. 42-1). They clearly did not begin using the instrument as a means to find an excuse for punishing Plaintiff. The key issue

is how they used the tool, not whether they did at all. Thus, criticizing the GTOI's effectiveness is likely to mislead the jury, and Delvin-Brown's opinion in this regard must be excluded. There is plenty of other evidence by which Plaintiff can validate her teaching performance.

In sum, Defendants' Daubert motion is granted in part and denied in part. The Court excludes Delvin-Brown's opinions concerning Plaintiff's management abilities, the limited knowledge and training of her staff, her understanding of her duties, and the ineffectiveness of the GTOI as a tool.

## III.   Conclusion

For the reasons stated above, Defendants' Daubert Motion to Exclude the Testimony of Angela Delvin-Brown (Doc. 26) is granted in part and denied in part. Their Motion for Summary Judgment (Doc. 27) is also granted in part and denied in part. Summary judgment is granted on Plaintiff's official-capacity claims against Principal Davis and Chappuis, her claim for intentional infliction of emotional distress, and all of her claims against Superintendent Cason. This case will be set for trial on the remaining claims.

**SO ORDERED**, this the 6th day of November, 2014.


*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

scr

36